THE PEOPLE OF THE STATE OF NEW YORK ex rel. BOARD OF COMMISSIONERS FOR IMPROVEMENTS ON THE GREAT CHAZY RIVER and Others, Respondents, *v.* F. M. SANCOMB and Others, Assessors of the Town of Dannemora, Clinton County, New York, Appellants.

Third Department, June 30, 1931.

*J. Edgar Downs* [*Patrick J. Tierney* of counsel], for the appellants.

*Allen & Allen* [*Seth S. Allen* of counsel], for the respondents.

*John J. Bennett, Jr., Attorney-General* [*Charles E. McManus, Assistant Attorney-General,* of counsel], *amicus curiæ.*

WHITMYER, J. The assessments in question were for the year 1929. The referee reported and the court adjudged thereupon that the tax is void (1) because the property is exempt from taxation, and (2) that the assessments do not properly and definitely describe the property.

The claim is that under section 4, subdivision 3-a, of the Tax Law (added by Laws of 1927, chap. 260) the property is situated within the limits of a public district, as defined by the General District Law (Laws of 1926, chap. 470), and is held for a public use, so that it is exempt.

That was one of the findings and is the sole basis of the judgment, which recites that the property is " held solely and exclusively for public use and to benefit the health, welfare, safety or convenience of the inhabitants of such district and for the purposes for which said district was established."

We have, then, to determine only the question whether or not the property is exempt.

The Board of Commissioners for Improvements on the Great Chazy River was created by chapter 289 of the Laws of 1868, entitled "An Act to provide for the improvement of the hydraulic power of the Great Chazy river, and to check freshets therein."

Section 1 provided for a board of commissioners, to be termed commissioners for improvements on the Great Chazy river, " For the purpose of improving the hydraulic power of the * * * river, and checking freshets therein."

Section 4 authorized the commissioners " to constitute, establish and improve Chazy lake as a reservoir, for the purposes specified in the first section," with the power to excavate a channel out of the lake or to erect a dam at the outlet thereof, with gates, whereby the waters of the lake could be retained or discharged, as the purposes of the act required.

Section 5 directed the commissioners to make a schedule and descriptions of the several lots and parcels of land on which there is hydraulic power dependent upon the waters of said river and to specify the ratio in which, in their judgment, such several lots and parcels would be benefited by the works contemplated by the act, with a right to a hearing before the county judge of the county.

Section 7 directed the commissioners to make a statement in detail of the expense already incurred and an estimate of the expense thereafter to be incurred for the completion of the improvement, to be apportioned, along with the amounts of the appraisal and the interest thereon and their fees, upon the real estate described in the schedule provided for in the 5th section of the act and in the ratio fixed.

And section 10 provided that the commissioners should cause the gates to be closed in times of freshets and floods, so as to check same, and should let out the water at such times as they might deem proper " with the view of preserving, so far as practicable, a uniform flow of water in said river, for the benefit of the hydraulic power of the river."

Thereafter, a patent for about 230 acres of land around the shore of the lake was issued to the commissioners, and a dam, costing about $22,000, was built at the expense of the power owners on the river. That dam went out in the year 1904, or thereabouts, and the present dam was commenced in 1924.

Before it was commenced, William H. Miner was developing water power on the river for his private enterprises and wanted more power. The power owners were opposed to an assessment, against themselves, sufficient to rebuild the dam. Contact was made with Mr. Miner and he offered to build the dam, if the commissioners would allow it. Thereupon, and on August 22, 1923, the commissioners, as a board, granted and conveyed to him, his heirs, successors and assigns, to the full and complete extent, to which they lawfully could, " all of the rights, powers and privileges conferred upon said Board of Commissioners by said statute," referring to the statute under which the board was created, in consideration of certain covenants and agreements on Miner's part. He agreed on the next day.

By the resolution and agreement he obtained the right, power

and privilege, among other things, to construct the dam, to main-
tain it and regulate the flow of water therefrom, and to appoint a
gatekeeper, upon certain conditions, including one that he should
at all times faithfully observe and comply with the legal require-
ments of the board, respecting such construction, maintenance,
repair or regulation.

The resolution and agreement were invana. (*People* v. *Super-
visors of St. Lawrence County*, 25 Hun, 131, 134.) But that question
is not here.

Thereupon, Mr. Miner built the present dam, on the site of the
old one, at a cost of about $57,000. And he controlled it from that
time on, paying the assessments, which have been laid against the
property in his name. Now, it is claimed that the dam and flow
lands are exempt.

In 1927, section 4, subdivision 3-a, of the Tax Law, relating to
property exempt from taxation, was passed.

It provides that property situated within the limits of a public
district, as defined by chapter 470 of the Laws of 1926, owned by
the district or the property owners therein and used exclusively
for the purpose for which the district was established, except as
otherwise provided by law, shall be exempt.

And by subdivision 1, section 2, chapter 470 of the Laws of 1926,
a public district is defined as one organized for the purpose of carry-
ing on, performing or financing one or more public functions intended
to generally benefit " the health, welfare, safety or convenience of
all or a portion of the inhabitants of such district, or to benefit
generally all or a portion of the property within such district."

Under the Tax Law, all property within the State is taxable,
unless exempt by law. (Tax Law, § 3; *People ex rel. Gould* v.
*Barker*, 150 N. Y. 52.) Exemptions are not favored and the burden
of proving one is on the person claiming it. (*People ex rel. Metro-
politan Street R. Co.* v. *New York State Board of Tax Comrs.*, 199
U. S. 1.)

The right to exemption from taxation, under subdivision 3-a of
section 4 of the Tax Law, requires the organization of a district for
the purpose of carrying on, performing or financing one or more of
the public functions therein specified. The act was passed about
fifty-nine years after the passage of the act under which the board
was created. That was before public districts were thought of.
Thereby a board was created for the purpose of improving the
hydraulic power of the river, for the benefit of the power owners and
for the purpose of checking freshets. A district was not organized,
and did not ever function as such. While the " health, welfare,
safety or convenience " of those below might be or were, incidentally,

benefited by the earlier act, there is nothing in it to show that such was the purpose. Only the interests of the power owners on the river were considered and subdivision 3-a of section 4 of the Tax Law does not apply. That is clear from the language and from what was done after it was passed.

Therefore, the judgment should be reversed, with costs to defendants.

All concur.

Judgment reversed on the law, with costs, and proceeding dismissed, with fifty dollars costs and disbursements.